**The document below is hereby signed.**

**Dated: September 27, 2011.**



**S. Martin Teel, Jr.**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

In re                              )
                                   )
NATION'S CAPITAL CHILD AND         )   Case No. 09-00576
FAMILY DEVELOPMENT, INC.,          )   (Chapter 11)
                                   )
            Debtor.                )
_____)
                                   )
NATION'S CAPITAL CHILD AND         )
FAMILY DEVELOPMENT, INC.,          )
                                   )
            Plaintiff,             )   Adversary Proceeding No.
                                   )   09-10019
        v.                         )
                                   )
MARYLYN TREE, LCC, *et al.*,       )
                                   )   **Not for Publication in**
            Defendants.            )   **West's Bankruptcy Reporter**

<u>MEMORANDUM DECISION</u>

In July 2010, the court held a four-day trial in the above-
captioned adversary proceeding on the plaintiff's claims.  The
following represents the court's findings of facts and
conclusions of law.

I

The plaintiff, Nation's Capital Child and Family Development
(Nation's Capital), is a non-profit organization that provides

child care services to underprivileged children in the District
of Columbia.  Nation's Capital was founded in 1964 and by 1999
had grown to include 27 child care centers.  In 1996, as part of
its expansion efforts, Nation's Capital purchased property at
2229 M Street, N.E., and undertook a $1.3 million renovation of
the property for use as a child care center.  The renovation was
financed by a District of Columbia bond issue, with Wachovia Bank
serving as the indenture trustee and holding a lien on Nation's
Capital's properties to secure the debt.

In the fall of 2006, Nation's Capital began to experience
financial difficulties.  In that year, Nation's Capital lost
major sources of federal and state funding for its child care
centers.  As a result, Nation's Capital was forced to close down
all of its centers except for the center at the newly-renovated M
Street property.  The revenues from this remaining center were
insufficient to service the debt on the bond, and Nation's
Capital fell behind on the loan.  In the spring of 2007 Wachovia
proceeded to foreclose on the property.

In an effort to keep the center operating, Nation's Capital
began looking for someone to purchase the M Street property at
foreclosure and lease it back to Nation's Capital.  In March
2007, Travis Hardmon, Nation's Capital's president and CEO, met
with David Cameron about filling this role.  David Cameron was
vice president and part-owner of Seville Builders, a construction

company that had done part of the demolition work on the M Street
property renovation.  Cameron agreed on behalf of Seville to
attempt to purchase the property at the foreclosure sale.

The successful bidder at the foreclosure sale was required
to put down a $50,000 deposit.  Although Seville had sufficient
funds for the deposit at the time Cameron had agreed with Hardmon
to purchase the property, as the foreclosure sale date approached
it found itself running short of money.  During this time,
Seville was involved in a construction project on Wisconsin
Avenue.  Although not an owner of the property, Seville had
agreed to guarantee the loan financing the project.  Prior to the
foreclosure sale, the bank funding the Wisconsin Avenue project
cut off funding and Seville opted to put the $50,000 it had
intended to use as a deposit on the M Street foreclosure sale
into the Wisconsin Street project.  To enable Seville to purchase
the M Street property, Hardmon arranged for a loan of $125,000 to
Seville from H&H Investments, a real estate investment company
owned by Hardmon's parents.  The loan was for three years,
payable in full at the end of the term.  Of the $125,000, $50,000
was to go towards the foreclosure sale deposit.  Seville used the
other $75,000 to provide additional funding for the Wisconsin
Avenue project.  At the foreclosure sale on May 9, 2007, Seville
was the successful bidder on the property at a price of $802,000.

After the foreclosure sale, Cameron approached Cardinal Bank

about financing the remainder of the purchase price.  As a
condition to making the loan, Cardinal required Seville to have a
lease in place with Nation's Capital that provided for a minimum
of $15,000 a month in rent and a $150,000 security deposit by
Nation's Capital.  As additional collateral, Seville was to place
$100,000 on deposit with the bank.  That $100,000 and the balance
of the purchase price was to be financed by Cardinal and secured
by the M Street property.  Trial Tr. 50, July 19, 2010.  Nation's
Capital retained Arent Fox to represent it in negotiating the
lease with Seville.  Arent Fox made several modifications to the
draft lease Cameron gave Nation's Capital, including, as relevant
to this proceeding, decreasing the security deposit from $150,000
to $7,500.  Cameron accepted all of Arent Fox's changes, except
for the change in the security deposit amount, which he left at
$150,000.  Some time between June 16, 2007, and October 2007,
Hardmon, on behalf of Nation's Capital, executed the lease with
Seville.  The effective date on the lease was May 24, 2007.

    After the parties executed the Seville lease, Seville
decided it would be better if the M Street property were held in
the name of a single-purpose entity.  Towards that end, Cameron
set up Marylyn Tree, LLC, a Nevada corporation and the named
defendant in this adversary proceeding.  On October 2, 2007, in
anticipation of Marylyn Tree becoming the owner of the property,
Nation's Capital and Marylyn Tree entered into a lease agreement

4

on the M Street property that was substantively identical to the lease Nation's Capital had executed with Seville, except for two material differences.  First, the Marylyn Tree lease set the security deposit at $15,000.  Second, the Marylyn Tree lease provided for a "first right to purchase":

> FIRST RIGHTS; Landlord agrees to give first right to purchase, notify Travis Hardmon of any and all changes to the property and building that may effect [sic] the security and future of the tenant; The Board of Directors of the Nation's Capital Child & Family Development, Inc. [s]hall be notified to any changes in changes [sic] to the financial ownership of premises at 2229 M Street NE, Washington, DC 20002.

Ex. 5, Lease, ¶ 4.6(B).

On October 12, 2007, Seville and Marylyn Tree closed on the property.[1]  Wachovia transferred title to the M Street property to Seville through a substitute trustee's deed at the $802,000 foreclosure sale price.  Less the $50,000 deposit and plus closing costs, Seville was required to deliver $777,603.50 at closing, and it raised sufficient funds for that purpose through its sale of the property to Marylyn Tree.  Seville, in turn, transferred title to Marylyn Tree at a sales price of $1,200,000.  Seville received $850,000 in cash from Marylyn Tree at closing and took a note for $350,000 from Marylyn Tree for the remainder

---

[1]    Actually, there were two closings: the closing on the sale by Wachovia to Seville, and the closing of the following sale by Seville to Marylyn Tree, but the sales were closed simultaneously, with Seville using the proceeds of the sale to Marylyn Tree to fund its purchase from Wachovia.

of the sales price.  Marylyn Tree partially financed the purchase from Seville with a $900,000 loan from Cardinal Bank ($100,000 of which went for the CD on deposit with Cardinal).  The Cardinal note was secured by a deed of trust and an Assignment of Leases, Rents, and Security Deposit.  Notably, the Assignment of Leases referred to the May 24, 2007, lease, the lease between Nation's Capital and Seville, not the new lease between Nation's Capital and Marylyn Tree that had the $15,000 security deposit and the "first right to purchase."  Seville secured its $350,000 note from Marylyn Tree with a deed of trust on the M Street property, which it agreed to subordinate to Cardinal's.  All told, then, the loans to Marylyn Tree secured by the M Street property totaled $1,250,000, with the $100,000 Cardinal CD serving as additional collateral on the Cardinal loan. Nation's Capital was unaware that Seville would take a deed of trust on the M Street property at the time it executed the Marylyn Tree lease.

On October 15, 2007, after settlement on the M Street property, Hardmon, on behalf of Nation's Capital, executed an Estoppel Certificate to Cardinal Bank.  Like the Assignment of Rents, the Certificate referenced a "Lease Agreement dated May 24, 2007 (the "Lease") by and between Seville Builders, Inc., as landlord, and Nation's Capital Child & Family Development, Inc. a District of Columbia non-profit Corporation (the "Tenant") as assigned by Seville Builders, Inc. to Marylyn Tree, LLC . . . ."

6

In the Certificate, Hardmon certified, as relevant here, (1) the Seville lease was "in full force and effect and ha[d] not been modified, assigned, suble[t], supplemented, amended or otherwise changed," (2) Nation's Capital had put down a $150,000 deposit, and (3) Nation's Capital had "no unwaived options or right of first refusal . . . with respect to purchasing any of the Premises." The Certificate made no reference to the Marylyn Tree lease, the terms of which were inconsistent with these representations.

In November 2007, Nation's Capital began to comply with its obligations under the Marylyn Tree lease. During that month, Nation's Capital paid the $15,000 security deposit due to Marylyn Tree under the October 2, 2007, lease, and made a rental payment of $7,500 in December 2007. In January 2008, Nation's Capital and Marylyn Tree agreed to a temporary rent reduction[2] which was memorialized in a letter from Cameron dated January 2, 2008. Under the terms of that agreement, Nation's Capital was to pay rent at the reduced rate of $8,500 per month from January 2008 through September 2008, with the amount by which the rent was

---

[2]   Hardmon testified that despite the terms of the lease, he and Cameron had agreed that Nation's Capital need only pay rent in an amount sufficient to cover the mortgage payment and that this letter was only necessary to provide to potential lenders in Cameron's efforts to refinance the property. Although I credit Hardmon's testimony in this regard, the issue of the appropriate amount of rent is not before the court and I do not address it here.

7

reduced, $58,500, due in full by December 31, 2008.

During this period, Seville continued to experience cash
shortfalls on its Wisconsin Avenue project and Cameron took
several actions with respect to the M Street property in efforts
to provide Seville with more funds for the project.  First, on
May 1, 2008, Cameron caused Seville to assign the $350,000
promissory note from Marylyn Tree to Mid-Atlantic Federal Credit
Union, the lender on the Wisconsin Avenue project.  In exchange,
Mid-Atlantic extended the maturity date on a promissory note
secured by the Wisconsin Avenue project and increased the
principal of that note.  Ex. 33.  Second, Cameron, acting for
Marylyn Tree in order to assist Seville, agreed to allow Mid-
Atlantic to place an indemnity deed of trust on the M Street
property to further secure the loan on the Wisconsin Ave.
project.  Third, Marylyn Tree listed the M Street property for
sale and began marketing the property.  Marylyn Tree received at
least one offer to purchase during this period, but no sale was
consummated.  Finally, in the summer of 2008, Cameron attempted
to refinance the M Street property.  Nation's Capital provided
Cameron with financial information to aid in this effort, but
ultimately Cameron was unable to find a lender willing to extend
financing.

At some point in the fall of 2008 Hardmon became concerned
about Cameron's efforts to refinance the property.  When Cameron

8

had initially undertaken efforts to refinance the M Street
property, Hardmon was under the impression that he was doing so
to allow Nation's Capital to own the property outright, paying
off the Cardinal Mortgage in full and leaving the property in
Nation's Capital's name.  According to Hardmon, this is why he
provided Cameron with financial information about Nation's
Capital.  Around November 2008, however, Hardmon received
information that Cameron was seeking to refinance the property in
order to remove equity for his own use.  Hardmon confronted
Cameron on the issue, but received no answer from him.  What
followed was a set of events that led to a total breakdown of the
relationship between the parties.

     The conflict began over a bounced rental check from Nation's
Capital to Marylyn Tree for September 2008.  On November 10,
2008, Cameron e-mailed Hardmon to notify him that Nation's
Capital's September rental check had bounced and, as a result,
Marylyn Tree had fallen behind on its mortgage payment.  Marylyn
Tree had arranged for Cardinal Bank to draft mortgage payments
directly from its account, and when Nation's Capital's September
rental check bounced, Marylyn Tree had insufficient funds in its
account to fund the draw.  Cameron's e-mail also advised Hardmon
that if the rental deposits were not brought current by November
12, 2008, the mortgage would be 60 days past due and foreclosure
would be imminent.  The parties eventually reconciled their bank

statements and determined that only November's rent remained
owing.

The conflict continued in a series of e-mails dated November
18, 2008.  Cameron initially e-mailed Hardmon clarifying that
although the mortgage payments to Cardinal had never technically
been late, the checking account from which those payments were
made was overdrawn by two months.  Cameron then stated that he
had brought in outside funds to cover the mortgage and expenses.
Hardmon, obviously frustrated and ostensibly concerned that any
default by Marylyn Tree would put Nation's Capital at risk,
replied that the solution was to remove both Marylyn Tree and
Cameron from the picture by having Nation's Capital assume the
Cardinal mortgage: "The resolution to the mortgage/property issue
is that we begin to work with [Cardinal Bank] on what it will
take to have another entity assume the mortgage.  This was the
original agreement and we need to stick to it."  Cameron did not
respond to the suggestion and decided to hire a property manager,
Greenlight International, to collect rent from Nation's Capital
and handle Marylyn Tree's obligations under the lease.  Ex. 40.

Two days later, on November 20, 2008, Cameron e-mailed
Hardmon to inquire about the status of the November rent payment.
Nation's Capital was waiting on delayed reimbursements from the
District of Columbia, and Hardmon replied that he hoped to have
funds for the November rent payment by the end of the month.  In

his reply, Hardmon again raised the issue of assumption, asking to address the issue directly with Cameron: "We need to talk about the issues related to the agreement regarding assuming the mortgage and clarify the current status of the mortgage, REFI etc. This has nothing to do with the lease. I think it would be most productive if you and I discuss these issues without a third, fourth, or fifth party." Cameron responded, briefly, that the mortgage with Cardinal was not assumable. Ex. NN.

As of December 4, 2008, Marylyn Tree had not paid its November rent, and Cameron again e-mailed Hardmon inquiring as to the status of the payment, copying Ty Green, principal of Greenlight, on the e-mail. Ex. 41. A series of contentious e-mails (on which Cameron was copied) between Hardmon and Green ensued. Because Green was new to the project, Hardmon drafted an e-mail in which he tried to set out both his understanding of the business relationship between Nation's Capital and Marylyn Tree and the conflict that had arisen between the parties:

> I think a few things need to be clarified as I am not
> sure how much information you have about this situation.
> This began as a partnership between Travis/NCCFD and
> Dave/Marylyn Tree. The relationship between Dave and I
> has been in existence for 15 years. The relationship
> between the NCCFD and Marylyn Tree, LLC as it relates to
> the [M Street] property began in May 2007. The agreement
> was that Dave/Marlyn Tree would purchase the property,
> lease it to NCCFD to provide child care services. In
> addition, within three years NCCFD or another entity
> would assume the existing mortgage. Dave would stay in
> the deal at approx 10%. NCCFD, consistent with a Triple
> net lease would be responsible for cost[s] associated
> with its operation.

. . . .

NCCFD's organization, including services to the children could be in jeopardy if Dave has or plans to refinance the [M Street] property. This will put NCCFD in a place where it will not be able to afford significant future - predatory increases in rent. In addition, and most importantly this was not part of the initial agreement related to assuming the mortgage. The expectation and agreement made in May of 2007 was that NCCFD or another entity would assume the existing mortgage at approx $900,000. That agreement did not include leveraging the future of the organization, including services to children by refinancing the property and pulling the equity out to support other struggling real estate projects which would increase the mortgage to approximately $1,600,000.

. . . .

NCCFD's organization, including services to children could be at risk as we have been told by [Cameron] on-line and through telephone discussions that the existing mortgage is delinquent because the mortgage is 60 days late[.] [W]e have also been told the property is heading for [fore]closure and we have been told that the mortgage has never been late because it has been paid with other funds through the term of the loan regardless of when the rent was paid. Therefore, we do not know the status of the mortgage even though once the payment is made on Monday, December 8, 2008, NCCFD will be current on rental payments through November, 08. NCCFD's intent is to resolve the delayed rent issue and begin paying the rent timely again in January 09.

Ex. 41. Appropriately, Green replied that he was not concerned with any "side deals" and that he was solely concerned with collecting the rent and servicing the property.

Through December and January, Hardmon continued to press the assumption issue directly with Cameron. On December 8, 2008, Hardmon, under Nation's Capital letterhead, mailed Cameron a letter setting forth his concerns regarding Cameron's efforts to

12

refinance the property and again requested that they "begin the process of assuming the mortgage on the Property." Ex. 22. On December 18, 2008, after Cameron had failed to respond to the letter, Hardmon e-mailed him a copy. When Cameron returned a nonresponsive reply later that day, Hardmon again pressed the issue. Ex. 42. On December 31, 2008, Hardmon asked again for Cameron's response to the letter. Ex. 45. On January 13, 2009, Cameron finally replied to Hardmon, writing, simply, "The mortgage is not assumable." Ex. 46.

On January 29, 2009, Hardmon drafted a second letter to Cameron, again outlining his understanding regarding both Nation's Capital's right to assume the Cardinal loan and its rental obligations under the lease. With respect to the assumption issue, Hardmon laid out in detail the agreement of the parties from May 2007:

> As for refinancing the property, on May 20, 2007, you made an agreement with NCCFD prior to the foreclosure sale of the property. The agreement was that you would purchase the property through the foreclosure process and lease it to NCCFD. In addition you agreed that NCCFD or an entity of NCCFD's choice would assume the mortgage within a three year period, which at the time was approximately $800,000.00. Once Cardinal Bank, the lender, was identified and agreed to finance the property, you informed NCCFD that the loan amount was $900,000.00, because Cardinal Bank wanted to reduce risk and therefore required that $100,000.00 be placed in escrow. At that time you informed NCCFD that the mortgage/loan payment was $7,900.00. In September 2007 you confirmed the original agreement made on May 20, 2007 and added that NCCFD or an entity of NCCFD's choice will assume the Cardinal Bank mortgage/loan of $900,000.00 within the same three year period.

13

Ex. 23.  Hardmon further noted in this letter that he had become
aware of the $350,000 deed of trust from Marylyn Tree to Seville.
Nation's Capital was not aware at this time that Seville had
assigned that mortgage to Mid-Atlantic.[3]  Even though the lease
had called for payment of $15,000, Hardmon's letter also set
forth his different understanding as to the amount and timing of
rental payments:

> The fact of the matter is that you requested that NCCFD
> sign various documents in your efforts to refinance the
> property, and we did so, without seeing the documents
> because we trusted you and to assist you before we became
> aware that the documents were fraudulent and that your
> refinancing efforts were putting NCCFD's business
> including the children at risk.  When the document
> attached to your email was signed by Brenda Jones and I,
> neither of us received any additional information from
> you other than the signature page.  In addition, the
> letter dated January 2, 2008, which was attached to the
> second email was created by me in an effort to assist you
> with refinancing efforts.  The letter was never intended
> to be an addendum to the lease.  You stated that it was
> needed in order to show prospective lenders that even
> though NCCFD had been making rent payments of $8,500.00
> per month, the rent payments would increase to $15,000.00
> per month in the future.
>
> If you examine the writing style it is clear that
> you did not write the letter and that the letter was
> written by me.  Secondly, you asked me to sign your name
> to the letter but I refused.  Finally, it would not make
> sense for NCCFD to agree to pay $15,000.00 per month when

---

[3]    Marylyn Tree entered into evidence an e-mail from May
27, 2008, wherein Cameron informed Hardmon that he was allowing
Mid-Atlantic to place an "IDOT" on the property.  The parties
testified that neither knew what an "IDOT" was.  Presumably, it
refers to an indemnity deed of trust to secure Seville's
guarantee to Mid-Atlantic on the Wisconsin Avenue project.  Given
that the Seville note was assigned on May 1, 2008, the IDOT
appears to be a further encumbrance on the M Street property and
not related to the Seville note.

> we already made an agreement to pay $8,500.00 per month.
> Again, this is another example of NCCFD's efforts to
> assist you and your decision to operate in a dishonest
> and despicable manner and use the letter in a fraudulent
> manner.
>
> Another fact is that prior to the development of the
> lease in the fall of 2007, NCCFD informed you that we
> could not afford lease payments of $15,000.00 per month.
> You informed us that in order to obtain the mortgage/loan
> from Cardinal Bank we needed to sign the lease which
> indicated a payment of $15,000.00 and a security deposit.
> You said that Cardinal Bank would not be concerned about
> the security deposit or the $15,000.00 rent payment as
> long as the monthly mortgage/loan payment of $7,900.00
> was paid.  At that point, it was agreed that NCCFD would
> make rent payments in the amount of $8,500.00 per month.
> We also agreed that rent payments would be made by the
> 12th of each month which would be consistent with [the]
> time frame when Cardinal Bank does an electronic debit
> from the Marylyn Tree bank account for the monthly
> mortgage/loan payment.
>
> Therefore based on the agreement, NCCFD will
> continue to pay $8,500.00 per month by the 12th of each
> month . . . .

Ex. 23.  Hardmon sent the letter by certified mail and also e-

mailed a copy to Cameron and Tyrone Green on February 3, 2009.

In late February 2009, Nation's Capital began to have

problems with the Early Care and Education Administration (ECEA)

of the D.C. Office of the State Superintendent of Education

regarding its licensing.  In a letter dated February 23, 2009,

ECEA wrote Hardmon to inform him that it had received information

on February 3, 2009, alerting the agency to Nation's Capital's

possible eviction for non-payment of rent.  ECEA asked that

Hardmon respond to the allegations by providing details on

Nation's Capital's rent payment history, details regarding any

impending eviction, and what impact any eviction would have on

the program.  Nation's Capital responded to the letter indicating
that no eviction proceedings were underway and providing the
requested information.  ECEA took no further action at that time.

Through February and March, the parties continued to dispute
the amount of rent due on the property.  Consistent with
Hardmon's January 29, 2009, letter, Nation's Capital continued to
make payments of $8,500 per month for the period.  Cameron
maintained that this amount was insufficient.  Cameron also
requested that Nation's Capital pay taxes on the property, as
provided for in the lease.  On April 7, 2009, Hardmon, through
his attorneys at DLA Piper, presented two options to resolve the
ongoing dispute as to the appropriate amount of rent to be paid
under the lease:  Nation's Capital would either (1) assume the
mortgage with Cardinal or refinance the property or (2) amend the
lease to provide for payments of $8,500 per month increasing to
$15,000 per month by May 2012.  In a letter from his counsel,
Cameron said he would consider the offer.  Ex. KK.

Meanwhile, Cameron began to look at a new tenant to take
over the M Street property.  An start-up child care center,
Flexicare, had heard that Nation's Capital's eviction from the M
Street property was imminent and approached Cameron sometime in
January 2009 about leasing the property.  Cameron and Martin
Freeman, Flexicare's principal, entered into a non-binding letter
of intent for Flexicare to rent the property upon Nation's

16

Capital's eviction.  On February 4, 2009, Freeman obtained a
certificate of occupancy for the property from the D.C.
Department of Consumer and Regulatory Affairs.  Ex. 31.  In
anticipation of starting the business, Freeman passed out flyers
for "Flexicare Child Development Center" at the M Street property
that listed the M Street property as the location of the
business.  Freeman also produced business cards, applications,
and other documents that listed Flexicare's address as being that
of the M Street Property, 2229 M Street, N.E.  Because the
eviction did not occur, Flexicare never began operations.

In April 2009, Marylyn Tree moved towards evicting Nation's
Capital from the property.  On April 21, 2009, Michael Brand,
counsel for Marylyn Tree, mailed Nation's Capital letters
notifying it that it was in breach of the lease and giving it
thirty days to quit the premises.  Thereafter, ECEA received
notice that Nation's Capital would soon be removed from the
property.  As a result, on May 6, 2009, ECEA put a "Stop
Placement Order" into effect on Nation's Capital.  The Order
prevented Nation's Capital from enrolling further students in the
program.

On May 8, 2009, in an effort to retain possession of the
property and continue operations, Nation's Capital commenced a
case in the Superior Court against Marylyn Tree, Seville, David
Cameron, 2136 Wisconsin, LLC, Greenlight, and Tyrone Green

17

seeking, among other things, specific performance of its "first

right to purchase" and damages for tortious interference with

Nation's Capital's relationship with ECEA.  Hardmon then

contacted ECEA to explain the situation between it and Marylyn

Tree and notify it that Nation's Capital had commenced the

lawsuit against the defendants.  ECEA found this explanation

satisfactory and lifted the stop placement order on May 15, 2009.

Upon receiving notice of Nation's Capital's lawsuit, Marylyn Tree

gave notice that it was terminating the lease.  It thereafter

filed an action to evict Nation's Capital from the property.  On

July 1, 2009, Nation's Capital filed a chapter 7 bankruptcy

petition in this court, staying the eviction action, and on

August 5, 2009, the trustee removed Nation's Capital's action in

the Superior Court to this court as the above-captioned adversary

proceeding.


II

Nation's Capital's complaint sets forth seven counts against

six named defendants.  Prior to removal, the Superior Court

entered default against 2136 Wisconsin and Seville.  After

removal but prior to the trial, David Cameron, Seville, and 2136

Wisconsin filed their own bankruptcy cases.  Thus, the

proceedings were stayed as to those entities.  Neither Tyron

Green nor Greenlight filed an answer to Nation's Capital's

18

complaint.[4]  Accordingly, the trial in July 2010 was limited to
Nation's Capital's claims against Marylyn Tree: Counts I, II, V
and VIII.[5]  At the close of the Plaintiff's evidence, I granted
Marylyn Tree's motion to dismiss counts II and V.  This opinion
addresses the remaining counts I and VIII, for specific
performance and civil conspiracy, respectively.

I bifurcated the trial to address the preliminary issue of
whether the Marylyn Tree lease represented an integrated
contract, thereby precluding any evidence of any agreement
between the parties with respect to Nation's Capital's right to
obtain title to the M Street property not contained within lease.
At the close of this phase of the trial, I concluded that lease
was intended by the parties to be a final, integrated agreement
and, thus, any right of Nation's Capital to take title to the
property must be found within the lease itself.  The second phase
of the trial addressed whether the lease provided any such right
and Nation's Capital's civil conspiracy count.

A

In Count I of its complaint, Nation's Capital seeks specific

---

[4]    While the documents filed with the court upon removal
reflect service of the complaint on Tyrone Green, there is no
affidavit of service for Greenlight International.

[5]  Nation's Capital misnumbered its complaint, skipping
count VII.  For ease of reference, I will continue to refer to
Nation's Capital's civil conspiracy count as count VIII, even
though it is the seventh count asserted in the complaint.

performance of its "first right to purchase" on the M Street property as provided in Section 4.6(B) of the lease between Nation's Capital and Marylyn Tree.  Nation's Capital contends that this provision entitles it to, within 3 years of the lease, either assume the loan from Cardinal or to purchase the property from Marylyn Tree with new financing for $752,000, the amount Seville purchased the property at the foreclosure sale less the $50,000 deposit loaned to Seville by H&H.  Marylyn Tree, in contrast, contends that this provision is merely a right of first refusal, exercisable only upon Marylyn Tree having received and accepted an offer to purchase the property.  The issue, then, is one of contractual interpretation.

District of Columbia courts adhere to "an 'objective' law of contracts, meaning 'the written language embodying the terms of an agreement will govern the rights and liabilities of the parties regardless of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite undertaking, or unless there is fraud, duress, or mutual mistake.'" *Dyal v. Bilaal,* 983 A.2d 349, 354-55 (D.C. 2009) (quoting *DSP Venture Grp., Inc. v. Allen*, 830 A.2d 850, 852 (D.C. 2003)).  Moreover, "[t]he writing must be interpreted as a whole, giving a reasonable, lawful, and effective meaning to all its terms," *1010 Potomac Assocs. v. Grocery Mfrs. of Am. Inc.*, 485 A.2d 199, 205 (D.C. 1984), and

20

those terms "must be interpreted in light of the circumstances

known to the parties at the time of contract formation,"

*District of Columbia v. District of Columbia Pub. Serv. Comm'n*,

963 A.2d 1144, 1155 (D.C. 2009).   Only if the terms of the

contract are ambiguous may the court look to extrinsic evidence

to discern the contract's meaning. *1010 Potomac,* 485 A.2d at 205.

A contract is ambiguous when it "is reasonably or fairly

susceptible to different constructions or interpretations."

*Debnam v. Crane Co.*, 976 A.2d 193, 197 (D.C. 2009).   In making

this determination, the court is to "examine the document on its

face, giving the language used its plain meaning."   *Id.*   As the

D.C. Court of Appeals has previously explained:

> A contract is not ambiguous merely because the parties
> disagree over its meaning, and courts are enjoined not to
> create ambiguity where none exists. . . .   Rather, a
> contract is ambiguous when, and only when, it is, or the
> provisions at controversy are, reasonably or fairly
> susceptible of different constructions or
> interpretations, or of two or more different meanings,
> and it is not ambiguous where the court can determine its
> meaning without any other guide than a knowledge of the
> simple facts on which, from the nature of language in
> general, its meaning depends. . . .   Accordingly, [t]he
> first step in contract interpretation is determining what
> a reasonable person in the position of the parties would
> have thought the disputed language meant.

*Washington Props., Inc. v. Chin, Inc.*, 760 A.2d 546, 548 (D.C.

2000).   If the court finds the contract ambiguous, "then the

court--after admitting probative extrinsic evidence--must

determine what a reasonable person in the position of the parties

would have thought the disputed language meant."   *In re Bailey*,

21

883 A.2d 106, 118 (D.C. 2005).

The term "first right to purchase" in Paragraph 4.6(B) is susceptible to different interpretations. While unfamiliar to this court, the phrase appears in 376 reported cases in Westlaw's "All Cases" database. Likewise, the similar phrase "first right *of* purchase" appears in 76 cases. Of the few cases that actually interpret these phrases, there is a split as to whether they represent a right of first refusal, as the defendant contends, or an option to purchase, as Nation's Capital advocates. Of the cases that have found it to be an option to purchase, a specific date by which right must be exercised has been found determinative. *In re Estate of Roether*, __ N.W.2d __, 2011 WL 3628899, at *8 (Iowa 2011) (finding that a "first right of purchase" provided in a will as an option exercisable within the four month term provided for by the will). Similarly, some courts have found an option where the contract "specified the purchase price, terms and manner of financing and time when the right could be exercised." *See Pruner v. Brown*, 216 Va. 885, 887 (1976). Alternatively, other courts find the use of the word "first" as determinative that a right of first refusal, and not an option, was intended. *Winberg v. Cimfel*, 248 Neb. 71, 76-77 (1995); Corbin on Contracts § 11.4 (1996). One thing clear from these cases, however, is that the phrase is not a shibboleth, and courts must look to the language surrounding the term and the

contract as a whole in determining whether it provides for an
option to purchase or a right of first refusal.  *See Steen v.
Rusted*, 313 P.2d 1014 (Mont. 1957) (construing the term "first
option to buy" as creating an option based on the language in the
lease as a whole).  I turn now to that language.

In addition to the "first right to purchase," Paragraph
4.6(B) obliges Marylyn Tree to both (i) "notify Travis Hardmon of
any and all changes to the property and building that may effect
[sic] the security and future of the tenant" and (ii) notify the
Nation's Capital Board of Directors of any "changes to the
financial ownership" of the property.  The notification to
Hardmon, although grammatically appended to the "first right to
purchase," does not appear substantively related to the right.
Rather, this clause seems solely to address Nation's Capital's
fear that the property would again be foreclosed upon and its
last operating center lost.  Accordingly, I give it no weight.
The second notification right, however, appears directly related
to the "first right to purchase."  If the parties intended the
"first right to purchase" to be an option to purchase the
property or assume the Cardinal Mortgage, it makes sense that
Nation's Capital would want to be apprised of all changes in
financial ownership in the property: Nation's Capital would need
to know who held such an encumbrance on the property in order to
pay off the encumbrance incident to a purchase or to attempt to

assume the encumbrance obligation in place of Marylyn Tree.
Likewise, if Nation's Capital wanted to assume the Cardinal
Mortgage, the extent of additional indebtedness on the property
would directly affect the payments Nation's Capital would have to
make to mortgagees to avoid foreclosure.  Alternatively, though,
if the parties intended the "first right to purchase" to be a
right of first refusal, the notification clause could be
construed as creating a duty on behalf of Marylyn Tree to notify
Nation's Capital of any change in encumbrances that would have to
be paid incident to exercising such right or to notify Nation's
Capital of any offers received.  Such notification would be
essential to Nation's Capital exercising any right of first
refusal.  Either interpretation is reasonable, and, thus, the
language surrounding the "first right to purchase" sheds no light
on the meaning of the clause.

Similarly, the other provisions of the contract provide no
help in discerning the first rights clause's meaning.  Oddly, the
first rights paragraph (¶ 4.6(B) of the lease) appears in Section
4.6, which addresses the tenant's duties, though Paragraph 4.6(B)
creates no obligations on the part of Nation's Capital.  It seems
likely that Cameron just found an empty spot in the contract and
added the clause in, unconcerned with whether the provision
logically belonged there.  Further, no other provisions of the
contract appear remotely related to the first rights clause: this

24

is a standard lease document with the "first right to purchase" clause added in.

In sum, neither the first rights clause itself nor the other language in the contract makes one interpretation more or less likely. The clause is equally susceptible to be construed as either an option to purchase or a right of first refusal. Accordingly, I conclude that the contract is ambiguous and turn to the extrinsic evidence.

The extrinsic evidence supports the conclusion that the "first right to purchase" was intended by both parties at the time they entered into the contract to be an option to purchase or assume the mortgage with Cardinal. Hardmon testified that when Cameron, on behalf of Seville, agreed to purchase the M Street Property at foreclosure, it was with the understanding that Nation's Capital would be able to assume the mortgage Seville would use to finance the purchase within a three year period. Cameron, in contrast, testified that no such agreement existed. I credit Hardmon's testimony.

First, the circumstances surrounding the appearance of the first rights clause in the Marylyn Tree lease support Hardmon's testimony. The first rights clause did not appear in the initial lease between Nation's Capital and Seville. Cameron testified that he added the clause into the Marylyn Tree lease because he had attended a continuing education course for real estate agents

and "one of the interesting things I heard was the tenant's
rights to purchase in the District of Columbia." Trial Tr. 55,
July 20, 2010. I find this explanation implausible. In essence,
Cameron asks the court to believe that he inserted a provision in
the contract that gave, even assuming it was limited to a right
of first refusal, important rights to Nation's Capital and
created express duties on behalf of Marylyn Tree with no
ostensible benefit to the company because it was an "interesting
thing" he heard at a continuing education course. This
explanation defies logic. Instead, the more likely reason for
the clause ending up in the agreement is that Nation's Capital,
the party deriving the entire benefit from the clause, wanted it
there because, consistent with Hardmon's testimony, it wanted the
right to purchase the property back from Marylyn Tree once things
turned around. I cannot believe that Cameron would place a new
clause that provides no benefit to Marylyn Tree in a contract
revised at length by attorneys at a large law firm who specialize
in these transactions because he attended a continuing education
course and found it "interesting." It makes no sense.

Marylyn Tree attempts to bolster Cameron's implausible
explanation by highlighting the fact that the first rights clause
did not appear in the original Seville lease and, therefore, it
could not have been important to Nation's Capital. The likely
explanation for the clause's absence, however, is that the

26

Seville lease with Nation's Capital was not intended by the parties to be the actual agreement.  The evidence strongly supports an inference that the Seville lease was entered into by the parties solely for the purpose of fraudulently inducing Cardinal Bank to finance the loan.[6]  Indeed, all the loan documents with Cardinal Bank indicate that the lease in force on the property is the Seville lease, see Exs. 13 (assigning lease dated May 24, 2007) and D (same), and it is likely that Cardinal remains unaware that the Marylyn Tree lease is the lease in force to this date.  As the Estoppel Certificate indicates, Cardinal would not have financed the loan under the terms of the Marylyn Tree lease.  Contrary to Cameron's assertion, Cardinal required a $150,000 deposit.  And, more importantly with respect to the first rights clause, Cardinal would not allow Nation's Capital to have any option to purchase or right of first refusal on the property.  Ex. D ¶ 11.  In light of these facts, it is unremarkable that the first rights clause did not appear in the Seville lease: it could not have.

Second, the course of dealing between the parties after the Marylyn Tree lease went into effect also supports a finding that the first rights clause was intended by the parties to be an option.  Cameron's actions with respect to Nation's Capital prior

---

[6]    Hardmon admitted as much in his January 29, 2009, letter to Cameron.  Ex. 23.

to the falling out between the parties shows that this was not a typical arm's-length transaction.  During this period Cameron appeared entirely unconcerned with the property as a revenue generating venture.[7]  Although the Marylyn Tree lease called for rental payments of $15,000 per month, Nation's Capital only paid the carrying costs of the property throughout the term of the lease.  Cameron testified that it was always the agreement between the parties that the rent was $15,000 per month and that any lesser payment was only to be on a temporary basis.  I do not credit Cameron's testimony in this respect.  As Marylyn Tree's rent role shows, Nation's Capital never paid an amount greater than $8,500 per month.[8]  This includes periods prior to the January 1, 2008, rent reduction and includes periods after the rent reduction ended on September 8, 2008.  Indeed, it is likely that the rent reduction was yet another ruse for purposes of keeping Cardinal in the dark as to the true agreement between the parties and, as Hardmon testified, to provide Cameron with documentation in his refinancing efforts.  Further, Marylyn Tree only seemed concerned with the rent when it received notice from

---

[7]    This is not to say that Cameron was not interested in using the equity in the property as a means of completing the Wisconsin Avenue project.  His assignment of the Seville mortgage to Mid-Atlantic and refinancing efforts amply demonstrate this.

[8]  Although there were some months where the rental payment was $15,000 or $17,000, these months were preceded by months for which there was no payment.  It is clear that these payments were both for that month and the prior month.

Cardinal that it had missed a mortgage payment.  When two of

Nation's Capital's checks bounced in September 2008, for example,

it was not until November 2008, after Cameron had received

multiple late notices from Cardinal, that he became concerned.

Ex. 39.  And even then, he was in the dark as to why the mortgage

payments had fallen behind.  Ex. 39.  The foregoing shows that

Marylyn Tree did not look at this as a typical investment

property, but, instead, was acting as a white knight for Nation's

Capital until it could regain its financial footing.  Construing

the first rights clause as an option is consistent with this

role.

Third, Cameron's consistent failure to deny that Nation's

Capital had any right to assume the mortgage once the

relationship between the parties began deteriorating likewise

cuts in favor of finding the first rights clause as an option.

Beginning in November 2008, Hardmon began pressing the assumption

issues.  Cameron declined to respond to most of Hardmon's

inquiries, and when he did respond it was always that "The

mortgage is not assumable," Ex. 46., or "Cardinal Bank mortgage

is not assumable," Ex. NN.  The language Cameron used is

important.  Never did he say that Nation's Capital had no right

to assume the mortgage, but, rather, he phrased his responses in

the passive, indicating that the mortgage was not assumable

because Cardinal would not allow it to be assumed.  If Nation's

29

Capital had only a right of first refusal on any potential
purchase, as Marylyn Tree maintains, any prudent manager in
Cameron's position would have made this clear when Hardmon kept
repeatedly pressing the assumption issue.  Cameron's failure to
do so is an implicit acknowledgment that the right existed.

Finally, even if Cameron never intended the first rights
clause to be an option to purchase, because he knew Nation's
Capital gave it this meaning and failed to correct its
understanding of the clause, the clause should be construed as an
option to purchase.  "Where the parties have attached different
meanings to a promise or agreement or a term thereof, it is
interpreted in accordance with the meaning attached by one of
them if at the time the agreement was made (a) that party did not
know of any different meaning attached by the other, and the
other knew of the meaning attached by the first party . . . ."
Restatement (Second) of Contracts § 201; *Samra v. Shaheen Bus. &
Inv. Grp., Inc.* 355 F. Supp. 3d 483, 508 (D.D.C. 2005).  Hardmon
testified that he thought the first rights clause gave Nation's
Capital the right to purchase the property within a three-year
period and that he had communicated this understanding to Cameron
when Cameron inserted the clause and highlighted it to Hardmon.
Trial Tr. 60, July 19, 2010.  Hardmon further testified that upon
communicating this to him, Cameron affirmed this meaning and did
not discuss this being a right of first refusal.  Although

Cameron testified he gave a different meaning to the clause, he did not refute that Hardmon had communicated his understanding of the clause to him and did not testify that he (Cameron) ever communicated his understanding to Hardmon.  Trial Tr. 55-61, 142-150, Jul. 20, 2010.  I find Hardmon's testimony credible in this respect and, thus, his meaning prevails.

Although I conclude that the "first right to purchase" should be construed as an option to purchase, because the option to purchase is subject to the statute of frauds and is missing an essential term, Nation's Capital is not entitled to specific performance.  Under the District of Columbia statute of frauds, to be enforceable, a contract for the sale of real estate, including an option to purchase real property, must be in writing.  D.C. Code. § 28-3502; *Mark Keshishian & Sons, Inc. v. Washington Square, Inc.* 414 A.2d 834, 840 (D.C. 1980); *Rosenkoff v. Finkelstein*, 195 F.2d 203, 204 (D.C. Cir. 1952).  The D.C. Court of Appeals has interpreted this to require that a contract for the sale of real property include "a sufficient description of the property to be sold, the price to be paid, and the names of the parties to the transaction."  *Apostolides v. Colecchia*, 221 A.2d 437, 438 (D.C. App. 1966) (citing *Fitzgan v. Burke*, 61 A.2d 721 (D.C. Mun. App. 1948)); *Ochs v. Weil*, 142 F.2d 758 (D.C. Cir. 1944).  Importantly, in a contract subject to the statute, "[n]one of these elements can be supplied by parol testimony."

31

*Fitzgan v. Burke*, 61 A.2d 721, 723 (D.C. App. 1948) (citing *Ochs*, 142 F.2d at 760). Here, while the Marylyn Tree lease contains both a sufficient description of the parties and the location of the property, there is no price term.

Nation's Capital nevertheless urges that the part performance and detrimental reliance exceptions remove this option from the statute of frauds. Under the part performance and detrimental reliance exceptions to the statute of frauds, a contract otherwise barred by the statute of frauds is enforceable when "a party's part performance shows 'unequivocal evidence of the alleged agreement,' or where the plaintiff has justifiably relied on the oral agreement to her detriment." *Zanders v. Reid*, 980 A.2d 1096, 1102-03 (D.C. 2009) (citations omitted). Importantly, "Nothing is part performance for this purpose (specific performance) which is only ancillary or preparatory: it must be a direct act which is intended to be a substantial part performance of an obligation created by the contract as proved; and it must be an act which would not have been done but for the contract; and it must be directly in prejudice of the party doing the act, who must himself be the party calling for the completion of the contract." *Storrow v. Concord Club of Washington, D.C.*, 63 App. D.C. 190, 194, 70 F.2d 852 (D.C. Cir. 1934) (quoting *Williams v. Morris*, 95 U.S. 444, 457 (1877)).

There are no cases in the District of Columbia applying the

32

part performance doctrine to options to purchase.  Cases applying
the standard in other contexts, however, provide the court with
guidance.  With respect to leases subject to the statute, the
D.C. Court of Appeals has found that moving into a property,
paying rent, and making renovations to a tenant's specification
were sufficient evidence to establish a lease.  *District of
Columbia Hous. Fin. Agency v. Harper*, 707 A.2d 53, 56 (D.C.
1998); *Hoffman v. F.H. Duehay, Inc.*, 62 App. D.C. 206, 206 (D.C.
Cir. 1933).  With respect to a sale of property, the making of
extensive repairs, *Patrick v. Hardisty*, 483, A.2d 692, 696 (D.C.
1984), or the payment of the purchase price coupled with an entry
into possession, *Townsend v. Vanderwerker*, 160 U.S. 171, 183
(1895) (reversing D.C. trial court decision, 9 Mackey 197, 1891
WL 10156 (D.D.C. 1891)), have been found sufficient to defeat the
defense.

Nation's Capital has not shown performance under the
agreement demonstrating unequivocal evidence of the alleged

option or detrimental reliance on it.[9]  While Nation's Capital

was in possession of the property and did pay rent, neither act

represents performance evidencing the option or detrimental

reliance upon it.  Nation's Capital was in possession of the

property prior to foreclosure, and its retention of possession is

as much evidence of the lease itself as it would be of an option

to purchase.  This is not sufficient to meet the exacting

"unequivocal evidence" standard adopted by the D.C. courts.

Similarly, Nation's Capital presented no evidence that remaining

in possession of the property was to its detriment: it presented

no evidence that by remaining in possession it gave up other

rights or opportunities, or otherwise was in a less advantageous

position.  Indeed, it was likely to Nation's Capital's benefit to

stay in possession of the property even if there were no option

---

[9]     At the close of the plaintiff's evidence in the first
phase of the trial, Marylyn Tree moved to dismiss on the basis
that if the "first right to purchase" were an option it would be
unenforceable under the statute of frauds.  In response, Nation's
Capital stated that it was not appropriate to address the
argument in that phase of the trial and that it would put on
evidence of part performance in the second phase.  Marylyn Tree
did not renew its statute of frauds argument at either the close
of Nation's Capital's evidence in the second phase or during
closing arguments.  Nevertheless, Marylyn Tree having raised the
argument in both its pretrial statement and during the trial, its
failure to raise it later did not constitute a waiver.  Because,
however, Nation's Capital did not have opportunity to adequately
respond to the argument at the close of all evidence, and if
there is a possible argument the court has overlooked, the court
would look favorably on a motion to reconsider addressing the
evidence presented at trial on this point.  Any such motion
should be filed within the deadlines set forth by Rule 59.

to purchase.  Likewise, Nation's Capital's mere payment of rent
is insufficient performance to evidence the agreement.  Again,
the payment of rent is at least as much evidence of the lease
itself as it would be of the option.  Such evidence does not meet
the "unequivocal evidence" standard.  Further, Hardmon presented
no evidence of independent consideration for the option
sufficient to show detrimental reliance.  Indeed, his testimony
was that the agreement was for Nation's Capital to pay just the
carrying costs of the property.  Moreover, even if Nation's
Capital had presented such evidence, the law regarding part
performance and detrimental reliance in D.C. provides that the
payment of money by itself is insufficient to remove a contract
from the statute of frauds under the part performance exception.
*Townsend v. Vanderwerker*, 160 U.S. at 183.

     For these reasons, Nation's Capital's specific performance
claim must fail.


                                    B

     The remaining count in Nation's Capital's complaint is for
civil conspiracy.  Particularly, Nation's Capital contends that
Marylyn Tree is liable in civil conspiracy for both fraud with
respect to the purchase and lease transaction on the M Street
Property and for tortious interference with respect to Nation's
Capital's contract with ECEA.

                                   35

To state a claim for civil conspiracy, Nation's Capital bears the burden of demonstrating "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; and (4) pursuant to, and in furtherance of, the common scheme." *Weishapl v. Sowers*, 771 A.2d 1014, 1023 (2001). Importantly, however, "[c]ivil conspiracy depends on performance of some underlying tortious act; thus it is not independently actionable." *Urban Dev. Solutions, LLC v. District of Columbia*, 992 A.2d 1255, 1269 (D.C. 2010).

### 1. *Civil Conspiracy to Advance Tort of Fraud*

To the extent Nation's Capital's civil conspiracy count is based on the underlying tort of fraud, it must fail because Nation's Capital has not met its burden with respect to the underlying claims and because it cannot show an actionable agreement between the defendants. Nation's Capital asserts two fraud counts in its complaint that are substantively identical. Substantively, the counts allege that Cameron (1) told Nation's Capital that he would purchase the property and lease it back to Nation's Capital until it was ready to resume ownership; (2) told Nation's Capital that he would only take out a first mortgage on the property and that the property would not be encumbered by additional debt; (3) told Nation's Capital that he would grant it

36

a right to first purchase that could be exercised within 3 years after he took title; and (4) told Nation's Capital that it could exercise that right by assuming the first mortgage. Further, the counts allege that Cameron failed to disclose that (1) Seville was the true owner of the property at the time Cameron induced Nation's Capital to sign the lease with Marylyn Tree; (2) that Cameron arranged to have title to the property transferred from Seville to Marylyn Tree after the Marylyn Tree lease had been signed; (3) that Cameron encumbered the property with the second deed of trust in favor of Seville; and (4) that the transactions and conveyances were undertaken for the benefit of Cameron and 2136 Wisconsin.  The counts differ only in the fact that Count IV seeks recovery against Cameron directly for his alleged misrepresentations and Count V seeks recovery against Seville, Marylyn Tree, and 2136 Wisconsin for Cameron's alleged misrepresentations as an agent for these entities.

To recover on a claim of fraudulent misrepresentation, Nation's Capital bears the burden of showing by clear and convincing evidence (1) a false representation or willful omission of material fact (2) knowledge of the misrepresentation or omission (3) intent to induce reliance upon the misrepresentation or omission, (4) reliance upon the misrepresentation or omission and (5) damages as a result of the reliance. *Schiff v. Am. Ass'n of Retired Persons*, 697 A.2d 1193,

1198 (D.C. 1997).

To the extent that the civil conspiracy count is based on **fraudulent representations** *by Cameron as agent for Seville*, the claim must fail because, like the fraud claim against Marylyn Tree, the integration clause in the Seville lease precludes any reliance by Nation's Capital.  With respect to misrepresentations, "a party alleging that it was defrauded, at least in the context of commercial dealings at arm's length, must establish not only that it actually relied on a false representation, but also that its reliance was objectively reasonable."  *Hercules & Co., Ltd. v. Shama Restaurant Corp.*, 613 A.2d 916, 933 (D.C. 1992) (citing *One-O-One Enter., Inc. v. Caruso*, 848 F.2d 1283, 1286 (D.C. Cir. 1988)).  Where the parties have negotiated a contract and that contract contains an integration clause, a claim for fraud cannot stand for representations not contained within that document because there could be no reasonable reliance.  *One-O-One Enters., Inc. v. Carus*, 848 F.2d 1283, 1287 (D.C. Cir. 1988).  As previously stated, except for the change in the deposit amount and the first rights clause, the Seville lease was identical to the Marylyn Tree lease.  As relevant here, Paragraph 16.8 of the lease provided that the lease "sets forth all the covenants, agreements, conditions and understandings between Landlord and Tenant concerning the Premises, and there are no covenants,

38

promises, agreements, conditions or understandings, either oral or written, between them other than those expressly[] set forth herein."  Further, Paragraph 16.20 of the Seville lease provides that Seville shall not be liable for representations not made in the lease:

> It is understood and agreed by Tenant that Landlord and Landlord's employees and agents have made no representations or promises with respect to the Premises or the making or entry into the Lease, except as in this Lease expressly set forth, and that no claim or liability, or cause for termination, shall be asserted by Tenant against Landlord for, and Landlord shall not be liable by reason of, the breach of any representation or promises not expressly stated in this lease.

The Seville lease was negotiated for Nation's Capital by Arent Fox, with substantial revisions made by the firm.  None of the alleged misrepresentations made by Cameron are contained in the lease.  Accordingly, there could be no reliance on the alleged misrepresentations and no claim for fraud could stand against Seville.  Thus, to the extent the civil conspiracy count is based on fraudulent misrepresentations made by Seville, it must fail.

Similarly, to the extent that Nation's Capital's civil conspiracy count is based on a **material omission** *by Cameron while acting as an agent for Seville*, Nation's Capital's claim must fail because either the omissions were not material or the claim is barred by the integration clause in the contract:

•   With respect to the allegation that Cameron failed to disclose that Seville was the true owner of the property at

39

the time Cameron induced Nation's Capital to sign the
Marylyn Tree lease, this is not a material omission.
Nation's Capital presented no evidence that it found this an
important point in entering into the lease or at all relied
upon it.  Further, Nation's Capital knew that Seville
purchased the property at foreclosure and that it would
eventually need to be transferred to Marylyn Tree.  The
timing of the changes in title is immaterial.

- With respect to the allegation that Cameron failed to
  disclose that Seville transferred the property to Marylyn
  Tree, Hardmon testified that Cameron had informed him of
  this prior executing the lease.  Trial Tr. 57, July 19,
  2010.  Accordingly, there was no omission.

- With respect to Cameron's failure to inform Nation's Capital
  that there would be a second deed of trust in favor of
  Seville, any cause of action based on a failure to disclose
  this fact is barred by the integration clause in the Seville
  lease.  As the Circuit Court determined in *One-O-One*,
  integration clauses bar not only fraud actions based on
  prior representations not contained in the final contract,
  but also prior nondisclosures "inconsistent with those
  representations."  *One-O-One Enters., Inc.*, 848 F.2d at
  1287.  Any nondisclosure by Seville of its intent to further
  encumber the property is directly inconsistent with

Cameron's alleged representation that Nation's Capital would be able to acquire the property by assuming the Cardinal loan, which amounts to representation that he would only take out a first mortgage on the property and that the property would not be encumbered by additional debt.  The omission and the statement are different sides of the same coin.  Under the doctrine set forth by the Court of Appeals in *One-O-One,* then, this claim is barred.

- Finally, with respect to the allegation that Cameron failed to disclose that the conveyances and transactions were for the benefit of Cameron and Seville, any claim based on this omission likewise fails under the Circuit Court's *One-O-One* decision.  This alleged omission, like the previous one, is a nondisclosure inconsistent with a prior representation. The harm Nation's Capital complains of here relates to its option to take title to the property: to the extent the transfers were for the benefit of Cameron and Seville, the cost for Nation's Capital to exercise its option increased and the option was impaired.  Really, what Nation's Capital complains of is, as above, the representation that Cameron would not further encumber the property.  While artfully pled, this omission reaches the same substance as that prior representation.  Thus, any claim based on the omission is barred by the integration clause in the Seville lease.

41

Accordingly, no civil fraud claim lies based on the acts of
Seville or Cameron acting as an agent for Seville, and thus no
civil conspiracy claim based on fraud can lie against Marylyn
Tree based on those acts.

To the extent Nation's Capital's civil conspiracy count is
based on a *fraud committed by 2136 Wisconsin*, the claim must fail
because Nation's Capital has failed to present any evidence that
2136 Wisconsin made any fraudulent misrepresentations or failed
to disclose any material information.  All the alleged
misrepresentations and failures to disclose relate to the M
Street Property.  Nation's Capital has presented no evidence of
any representation made by 2136 Wisconsin that it relied upon in
entering into the transactions and has shown no material omission
with respect to 2136 Wisconsin that was to its detriment.
Indeed, I find that 2136 Wisconsin had no role in setting up the
transaction and Cameron was not acting on its behalf in
negotiating the leases.  Accordingly, Nation's Capital's civil
conspiracy claim based on a fraudulent misrepresentation or
omission by 2136 Wisconsin fails.

To the extent the civil conspiracy count is based on
*fraudulent misrepresentations or omissions made by Cameron
individually*, it must fail (as against Marylyn Tree) because
there could have been no actionable agreement between Marylyn
Tree and Cameron.  Any misrepresentations Cameron made prior to

42

August 16, 2007, the date Marylyn Tree incorporated, are not
actionable because Marylyn Tree was not in existence and, thus,
incapable of entering into any agreement.  Further, any
misrepresentation by Cameron after that point would be barred by
the intracorporate conspiracy doctrine, which provides that "a
corporation cannot conspire with its employees, and its
employees, when acting in the scope of their employment, cannot
conspire among themselves."  *See Exec. Sandwich Shoppe, Inc. v.
Carr Realty Corp.*, 749, A.2d 724, 738 (D.C. 2000) (remanding a
case to the Superior Court to consider the effect of the
intracorporate conspiracy doctrine on the plaintiff's civil
conspiracy claim).  Nation's Capital presented no evidence that
Cameron was acting other than in his role as managing member when
he made the alleged misrepresentations and, thus, there could be
no actionable agreement to commit the fraud.

In conclusion, whoever Cameron was acting for, no claim of
civil conspiracy based on fraud lies against Marilyn Tree based
on misrepresentations or material omissions by him.

## 2.   *Civil Conspiracy to Advance Tortious Interference with Contract*

Lastly, to the extent Nation's Capital's civil conspiracy
count is based on the underlying tort of tortious interference,
it must fail because Nation's Capital has not shown a breach of
the ECEA contract.  Under District of Columbia law, a necessary

43

element of tortious interference with contract is that a breach
of the contract at issue result from the defendant's conduct.
*Murray v. Wells Fargo Home Mortg.*, 953 A.2d 308, 326 (D.C. 2008)
(citing *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48
F.3d 1260, 1266 (D.C. Cir. 1995)).  Nation's Capital presented
evidence showing that either Cameron, Tyrone Green, or Greenlight
International contacted ECEA to notify it that Nation's Capital's
eviction from the M Street property was imminent.  Nation's
Capital further presented evidence that as a result of this
contact ECEA put in force a temporary stop placement order,
thereby keeping Nation's Capital from enrolling new children for
a nine-day period.  Nation's Capital does not allege that ECEA
breached its contract by putting in place the stop placement
order, and its contract with ECEA appears to have remained in
effect through the date of the trial.  Without a breach, any
tortious interference claim against Cameron, Green, and
Greenlight would fail.  Thus, any civil conspiracy claim against
Marylyn Tree seeking to hold it vicariously liable likewise
fails.

For these reasons, Nation's Capital's civil conspiracy count
must be dismissed.


III

For the foregoing reasons, I will dismiss Nation's Capital's

44

complaint.  A separate order follows.

[Signed and dated above.]

Copies to: All counsel of record.